1

2

3

4

5

6

7

8

9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

10 | CAAS TECHNOLOGIES, LLC,

11 | Plaintiff,

12 | v.

13 | ENVISION TELEPHONY, INC.,

14 | Defendant.

CASE NO. C15-0624JLR

CLAIM CONSTRUCTION
ORDER

15

## I.   INTRODUCTION

16   This matter comes before the court in order to construe terms in United States

17   Patent No. 8,433,915 ("the Patent"), entitled "Selective Security Masking Within

18   Recorded Speech" (the "Invention"), which covers a system of identifying and securing

19   personal information disclosed in electronic communications.  (Compl. (Dkt. # 1) ¶ 5, Ex.

20   A ("Patent") at 1:1-2.)  Plaintiff CAAS Technologies, LLC, owns the Patent and alleges

21   that Defendant Envision Telephony, Inc., infringes claim 1 of the Patent through its

22   Click2Coach software.  (*See* Compl.)  Envision denies infringing and counterclaims for

1   declaratory judgments of non-infringement and invalidity.  (*See* Ans. & CCs (Dkt. # 8).)

2   The court has considered the parties' briefing and supporting materials and heard oral

3   argument from the parties at a *Markman* hearing held on May 19, 2016.  This order

4   memorializes the court's construction of the disputed terms of the Patent.

5                                    **II.    BACKGROUND**

6           CAAS owns the Patent and alleges that Envision induced infringement or

7   committed contributory infringement of claim 1.[1]  (Compl. ¶¶ 8-11.)  The Patent

8   discloses a method for monitoring telephonic conversations, detecting when a caller is

9   providing personal information, and rendering that personal information unintelligible on

10  the corresponding recording.  (*See generally* Patent.)  The independent claims of the

11  Patent—claims 1, 8, 10, and 14—describe correlating various types of input to determine

12  whether the caller is providing personal information and rendering that information

13  unintelligible.  (*Id.* at 20:49-22:24.)

14

15  _____

16      [1] The language of claim 1 is:

17  A method comprising:
    identifying an activity performed in an area of a user interface during a voice

18          recording of a verbal interaction comprising a speech signal, wherein the
            activity comprises motion of a pointing device associated with the area;
    evaluating the motion of the pointing device by correlating the activity with at

19          least a part of the speech signal that corresponds with special information and
            determining a correlation value for the special information;

20  applying a threshold to the correlation value and rendering the special information
            unintelligible when the correlation value satisfies the threshold; and

21  analyzing the voice recording to provide feedback to a business based on the
            interaction.

22  (Patent at 20:49-63.)

ORDER- 2

1      As an example, a caller might place a telephone call to a customer service

2  representative to set up an account.  During the call, the customer may provide personal

3  information, such as a birthdate or social security number, as part of the account setup

4  process.  The Invention monitors the activity on the representative's computer screen to

5  determine if and when the caller is likely providing personal information.  When the

6  likelihood reaches a certain threshold, the Invention renders the corresponding portion of

7  the call unintelligible on the recording.  Claim 1 relates only to analyzing motion from a

8  "pointing device," such as a mouse or a stylus, to help determine when the caller is

9  providing personal information.  (*Id.* at 20:53.)

10      CAAS asserts that Envision indirectly infringes claim 1 of the Patent by providing

11  its Click2Coach software to companies operating call centers.  (Jt. Prehearing Stmt. (Dkt.

12  # 25) ¶ g, Ex. 2 ("Infr. Alleg.") at 3.)  Click2Coach can allegedly monitor and record

13  incoming voice calls and the corresponding activity on the call agent's desktop software.

14  (*Id.* at 4-5.)  When the call agent moves her pointing device within a data field related to

15  the caller's credit card validation code, Click2Coach allegedly pauses the recording of the

16  conversation.  (*Id.* at 5-7.)  Finally, Click2Coach allegedly provides Envision's customers

17  with metrics regarding customer interactions, which is also an element of claim 1.  (*Id.* at

18  8.)  CAAS alleges that this functionality infringes on claim 1 of the Patent.

19      Each party has submitted an opening brief, a response brief, and supplemental

20  briefing following the hearing on May 19, 2016.  (CAAS Op. Br. (Dkt. # 27); Envision

21  Op. Br. (Dkt. # 26) at 8; CAAS Resp. Br. (Dkt. # 30); Envision Resp. Br. (Dkt. # 31);

22

ORDER- 3

1  CAAS Supp. Br. (Dkt. # 35); Envision Supp. Br. (Dkt. # 36).)  Seven disputed terms

2  from claim 1 are now before the court for construction.[2]

3  **III.    ANALYSIS**

4  **A.    Legal Standard**

5       The court has the sole responsibility for construing patent claims.  *Markman v.*

6  *Westview Instruments, Inc.*, 517 U.S. 370, 372 (1996).  The court construes claims as a

7  matter of law, though the court may make subsidiary factual findings regarding extrinsic

8  evidence.  *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, --- U.S. ---, 135 S. Ct. 831, 836-38,

9  840-42 (2015).  In practice, executing the *Markman* mandate means following rules that

10  rank the importance of various sources of evidence of the "true" meaning of claim terms.

11       The Federal Circuit summarized its view of the claim construction rules in *Phillips*

12  *v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc).  Although the case focused on

13  the role of dictionaries in claim construction, it also provided an overview of the claim

14  construction process.  Intrinsic evidence, which includes the patent and its prosecution

15  //

16  //

17  //

18  //

19  _____

20      [2] The parties initially presented 10 disputed terms to the court (Jt. Prehearing Stmt. ¶ 1,

21  Ex. 1 ("Jt. Claim Chart") at 1-8), but they have since agreed on the following constructions:  (1) a "pointing device" is an "input device that controls the placement of a cursor or pointer on a computer screen"; (2) "special information" is "personal, private, confidential and/or sensitive

22  information within a speech signal, depending on the context of a verbal interaction"; and (3) "unintelligible" means "impossible to understand."

history, is the primary source from which to derive a claim's meaning.[3]  *Id.* at 1314.  The

court's task is to determine the "ordinary and customary meaning" of the terms of a claim

in the eyes of a person of ordinary skill in the art on the filing date of the patent.  *Id.* at

1313 (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir.

1996)).  In its review of intrinsic evidence, the court should begin with the language of

both the asserted claim and other claims in the patent.  *Id.* at 1314; *see also Biagro W.*

*Sales, Inc. v. Grow More, Inc.*, 423 F.3d 1296, 1302 (Fed. Cir. 2005) ("It is elementary

that claim construction begins with, and remains focused on, the language of the

claims."); *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111,

1116 (Fed. Cir. 2004) ("[C]laim construction analysis must begin and remain centered on

the claim language itself.").

　　　　The court must read claim language, however, in light of the remainder of the

patent's specification.  *Phillips*, 415 F.3d at 1316 ("[T]he specification necessarily

informs the proper construction of the claims.").  The specification acts as a

"concordance" for claim terms, and is thus the best source beyond claim language for

understanding claim terms.  *Id.* at 1315.  The inventor is free to use the specification to

---

[3] A patent is composed of three parts:  (1) a "written description," which consists of an often lengthy exposition of the background of the invention, at least one embodiment of the invention, and other written material that assists in understanding how to practice the invention; (2) (in most cases) a set of drawings that illustrates portions of the written description; and (3) the claims, which delimit the scope of the invention.  *General Foods Corp. v. Studiengesellschaft Kohle mbH*, 972 F.2d 1272, 1274 (Fed. Cir. 1992).  Together, these three components make up the patent's "specification."  *Atmel Corp. v. Information Storage Devices, Inc.*, 198 F.3d 1374, 1384 (Fed. Cir. 1999); 35 U.S.C. § 112.  However, although 35 U.S.C. § 112 includes the claims as part of the specification, many courts and practitioners use the term "specification" to refer to all portions of a patent except the claims.  In most instances, the context will reveal what portion of the specification is at issue.

1   define claim terms as she wishes, and the court must defer to the inventor's definitions.

2   *Id.* at 1316 ("[T]he inventor's lexicography governs."). The court should "rely heavily"

3   on the specification in interpreting claim terms. *Id.* at 1317. The court should not,

4   however, commit the "cardinal sin" of claim construction—impermissibly reading

5   limitations from the specification into the claims. *Id.* at 1320 (citing *SciMed Life Sys. v.*

6   *Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1340 (Fed. Cir. 2001)). Although a

7   court should limit the meaning of a claim where the "specification makes clear at various

8   points that the claimed invention is narrower than the claim language might imply," the

9   court must not read particular embodiments and examples appearing in the specification

10   into the claims unless the specification requires it. *Alloc, Inc. v. Int'l Trade Comm'n*, 342

11   F.3d 1361, 1370 (Fed. Cir. 2003); *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d

12   1560, 1571 (Fed. Cir. 1988). Additionally, although drawings illustrating the invention

13   may be used in construing claims, "the mere fact that the patent drawings depict a

14   particular embodiment of the patent does not operate to limit the claims to that specific

15   configuration." *Prima Tek II, L.L.C. v. Polypap, S.A.R.L.*, 318 F.3d 1143, 1148 (Fed. Cir.

16   2003).

17        More recently, the Federal Circuit has emphasized the importance of reading the

18   claims in the context of the specification and prosecution history.[4] *Laryngeal Mask Co.*

19   *v. Ambu*, 618 F.3d 1367, 1370 (Fed. Cir. 2010) ("The words of a claim are generally

20   ───────────────

21       [4] The prosecution history exists independently of the patent. It consists of the inventor's
application to the United States Patent and Trademark Office ("PTO") and all correspondence

22   between the PTO and the inventor documenting the invention's progress from patent application
to issued patent. *Vitronics*, 90 F.3d at 1582.

1  given their ordinary and customary meaning as understood by a person of ordinary skill

2  in the art in question at the time of the invention when read in the context of the

3  specification and prosecution history.")  Although the patent's prosecution history is also

4  intrinsic evidence, it is "less useful for claim construction purposes" than the

5  specification. *Phillips*, 415 F.3d at 1317.  Because the prosecution history documents an

6  invention's evolution from application to the issuance of the patent, it usually "lacks the

7  clarity of the specification." *Id.*  The prosecution history is useful, however, in

8  determining when an inventor has expressly disavowed certain interpretations of her

9  claim language. *Id.*  Specifically, a patentee may limit the meaning of a claim term by

10  making a clear and unmistakable disavowal of scope during prosecution. *Computer*

11  *Docking Station Corp. v. Dell, Inc.*, 519 F.3d 1366, 1374-75 (Fed. Cir. 2008).  A patentee

12  could do so, for example, by clearly characterizing the invention in a way to try to

13  overcome rejections based on prior art. *Id.*  The doctrine of prosecution disclaimer

14  "protects the public's reliance on definitive statements made during prosecution" by

15  "precluding patentees from recapturing through claim interpretation specific meanings

16  [clearly and unmistakably] disclaimed during prosecution." *Id.* (citations omitted).

17         Finally, the court can consider extrinsic evidence, "including expert and inventor

18  testimony, dictionaries, and learned treatises." *Phillips*, 415 F.3d at 1317 (citing

19  *Markman*, 52 F.3d at 980).  For a variety of reasons, extrinsic evidence is usually "less

20  reliable than the patent and its prosecution history" as a source for claim interpretation.

21  *Id.* at 1318.  The court thus need not admit extrinsic evidence, but may do so in its

22  discretion. *Id.* at 1319.

ORDER- 7

1    With this general framework in mind, the court turns to the disputed claim terms.

2  **B.    Disputed Terms**

3    The parties ask the court to construe the following seven terms:  (1) "motion of a

4  pointing device"; (2) "evaluating the motion of a pointing device"; (3) "correlating"; (4)

5  "correlation value"; (5) "determining a correlation value for the special information"; (6)

6  "applying a threshold to the correlation value"; and (7) "rendering the special information

7  unintelligible."  The court first construes, one-by-one, those terms for which construction

8  is appropriate and then explains why the remaining terms do not warrant construction.

9    1.  Disputed Term One:  "motion of a pointing device"

10    The term "motion of a pointing device" appears in claim 1 of the Patent.  (Patent

11  at 20:53; *see also id.* at 20:55 ("motion of the pointing device").)  The parties offer the

12  following competing constructions.

13    **CAAS's Proposed Construction:**  "input corresponding to control of the

14  placement of a cursor or pointer on a computer screen."  (CAAS Op. Br. at 6.)

15    **Envision's Proposed Construction:**  "movement of a pointing device between

16  areas on a user interface screen."  (Envision Op. Br. at 8.)

17    CAAS's proposed construction would encompass periodic input controlling the

18  cursor or pointer, whereas Envision's proposed construction seeks to limit this term to

19  continuous movement or input.  (*See* CAAS Op. Br. at 8-9.)  For the reasons explained

20  below, the court agrees with CAAS that the term encompasses periodic input, but the

21  court alters CAAS's proposed construction to provide greater clarity.

22

ORDER- 8

1    Envision first argues that a plain reading of the claim language demonstrates that

2   movement is required.  (Envision Op. Br. at 8.)  If the court adopts CAAS's construction,

3   Envision argues, it would be "as if the word 'motion' does not even exist in the claim."

4   (Envision Resp. Br. at 2.)  This characterization is inaccurate.  CAAS's proposed

5   construction does not read out the word "motion," but rather impliedly posits that a

6   person of ordinary skill in the art would understand "motion" in the context of the Patent

7   to contemplate both continuous movement between points and periodic input

8   corresponding to the placement of the cursor or other position indicator on a computer

9   screen.  *See Phillips*, 415 F.3d at 1313 ("[T]he ordinary and customary meaning of a

10   claim term is the meaning that the term would have to a person of ordinary skill in the art

11   in question at the time of the invention . . . .").  The court agrees that "motion" could be

12   naturally read to capture either or both of those manifestations.[5]

13    The intrinsic evidence supports the court's conclusion that CAAS's proposed

14   construction is more accurate.  The specifications describe two principal embodiments for

15   determining when the caller is providing special information:  a trajectory embodiment,

16   //

17   //

18   _____

19    [5] Indeed, some of the extrinsic evidence to which Envision cites favors CAAS's position.
     (*See* Envision Op. Br. at 10.)  Envision refers the court to the Second College Edition of the
20   American Heritage Dictionary, which defines "motion" as "[t]he action or process of changing
     position."  (*See id.* (citing Lowe Decl. (Dkt. # 29) ¶ 4, Ex. C at 816).)  Envision draws the
21   conclusion that "motion" is a "dynamic concept focused on change, and not mere static
     position."  (*Id.*)  However, nothing in the American Heritage Dictionary's definition of "motion"
22   requires that "motion" refer to a continuous—as opposed to a periodic—"changing [of]
     position."  (Lowe Decl. Ex. C at 816.)

1   which evaluates the vector on which the cursor travels[6] (*see, e.g.*, Patent at 12:9-35), and

2   a minimum/maximum embodiment, which evaluates the placement of the cursor[7] (*see,*

3   *e.g., id.* at 11:60-12:8).  The minimum/maximum embodiment contemplates provision of

4   periodic input as a method of controlling the cursor placement.  Envision acknowledges

5   that its proposed construction would preclude claim 1 from covering the

6   minimum/maximum embodiment but contends that Federal Circuit caselaw supports its

7   position.  (Envision Resp. Br. at 3-4 (citing *August Tech. Corp. v. Camtek, Ltd.*, 655 F.3d

8   1278, 1285 (Fed. Cir. 2011)) ("There is no requirement that a claim construction

9   encompass each and every embodiment disclosed in the patent specification.").)

10         The "language of the claim" governs where it conflicts with an embodiment

11   disclosed in the patent, especially where the language is supported by intrinsic evidence.

12   *TIP Sys., LLC v. Phillips & Brooks/Gladwin, Inc.*, 529 F.3d 1364, 1369 (Fed. Cir. 2008);

13   *see also August Tech.*, 655 F.3d at 1285.  However, as the court concluded above, the

14   language of the claim does not conflict with the embodiment encompassing periodic

15   positional input.  Just as it constitutes "motion of a pointing device" when a user slides

16   her pointer across the computer screen by operating a mouse, it constitutes "motion of a

17   pointing device" when a user alters the location of her pointer by pressing on a different

18

19   ────────────────

[6] For instance, the Invention gets progressively more confident that the caller is providing
20   or about to provide special information as the mouse moves the cursor toward the data entry box
     for the caller's social security number.  (*See* Patent at 12:9-35.)

21      [7] For instance, the Invention immediately realizes that the caller is providing or about to
     provide special information when a stylus moves the cursor into the data entry box for the
22   caller's social security number.  (*See* Patent at 11:60-12:8.)

ORDER- 10

1  part of the screen with a stylus.[8]  These are merely two different methods of conveying

2  motion to a computer screen.

3       The principle against importing limitations from the specification into the claims

4  further guides the court in this context.  *See Liebel-Flarsheim Co. v. Medrad, Inc.*, 358

5  F.3d 898, 906 (Fed. Cir. 2004) (quoting *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d

6  1313, 1327 (Fed. Cir. 2002)) ("Even when the specification describes only a single

7  embodiment, the claims of the patent will not be read restrictively unless the patentee has

8  demonstrated a clear intention to limit the claim scope using 'words or expressions of

9  manifest exclusion or restriction.'").  Here, the specification describes multiple

10  embodiments, and Envision would have the court limit the meaning of "motion" based on

11  only the trajectory embodiment.  (Envision Op. Br. at 9; Envision Resp. Br. at 4.)

12  Because the intrinsic evidence does not demonstrate "a clear intention to limit the claim

13  scope" in this fashion, the court declines to do so.  *Liebel-Flarsheim*, 358 F.3d at 906.

14       Envision's argument would have greater force if the Patent's other claims captured

15  the periodic input embodiment described in the specifications.  *See August Tech.*, 655

16  F.3d at 1285 (concluding that where "other unasserted claims in the patent cover the

17  excluded embodiments," it is "especially true" that the claim language need not be

18  contorted to cover those embodiments).  The specification makes clear that the

19  minimum/maximum embodiment can be used in conjunction with a pointing device.

20  _____

21       [8] The parties' agreed definition of "pointing device"—an "input device that controls the
22  placement of a cursor or pointer on a computer screen"—clearly covers both a mouse and a
   stylus. *See supra* n.2.

ORDER- 11

1  (Patent at 11:6-11 ("FIG. 7 illustrates . . . correlating activity in a user interface with

2  special information according to embodiments of the invention. . . . Activity includes, but

3  is not limited to, moving a pointing device into a field of a user interface that corresponds

4  with special information.").)  However, as Envision acknowledges, "[t]he three other

5  independent claims 8, 10 and 14 do not evaluate the motion of a pointing device."

6  (Envision Supp. Br. at 5.)  In other words, the Patent's other claims fail to capture the

7  embodiment that uses the minimum/maximum technique on a pointing device, which the

8  court has concluded comports with the language of claim 1.  As such, the court will not

9  construe claim 1 to omit this embodiment.

10      Finally, Envision contends that the prosecution history supports its argument that

11  claim 1 requires continuous rather than periodic motion.  (Envision Op. Br. at 9-10.)

12  During the prosecution of the Patent, the inventor authorized the Examiner to incorporate

13  from dependent claims into an independent claim the following terms:  "evaluating

14  motion of the pointing device" and "wherein the activity comprises motion of a pointing

15  device."  (Envision Op. Br. at 9-10; *see also* Lowe Decl. ¶ 3, Ex. B at ECF 39.)  That

16  independent claim eventually became claim 1 in the Patent.  (Envision Op. Br. at 10; *see*

17  *also* Lowe Decl. ¶ 3, Ex. B at ECF 39.)  Envision argues that "'motion of a pointing

18  device' is thus a necessary condition for the patentability of the claim" and "[t]o read out

19  the word 'motion' from this limitation would be to undo one of the main requirements

20  made by the Examiner."  (Envision Resp. Br. at 3.)

21      Envision is correct but to no end.  This argument rests on the same flawed premise

22  as several of its other arguments—that "motion" necessarily requires continuous

ORDER- 12

1 movement.  As the court has concluded, in the context of the Patent, "motion" does not

2 require continuous movement.  Thus, although the prosecution history can help determine

3 when an inventor has expressly disavowed certain interpretations of her claim language,

4 no such "clear and unmistakable" disavowal happened here.  *Phillips*, 415 F.3d at 1317;

5 *Computer Docking*, 519 F.3d at 1374-75.

6     The foregoing analysis leads the court to conclude that claim 1 encompasses

7 periodic movement of the pointing device.  However, CAAS's proposed construction is

8 nonetheless flawed because it fails to clarify that the relevant input must come from a

9 pointing device.  (*See* Envision Resp. at 2-3 ("CAAS's construction would read on any

10 input, such as electromagnetic signals (*e.g.*, generated by a mouse, pointer, or keyboard)

11 or even human keystrokes or hand motions, which corresponds to screen pointer

12 placement.").)  Accordingly, the court adopts much of CAAS's proposed construction but

13 adds language to make clear that the "input" must be made by a "pointing device."  The

14 court construes "motion of a pointing device" to mean "input that comes from a pointing

15 device and controls the placement of a cursor or pointer on a computer screen."[9]

16     2.  Disputed Term Four:  "correlation value"

17     The term "correlation value" appears in claims 1, 8, 10, and 14 of the Patent.

18 (Patent at 20:58-61, 21:21-23, 21:46-48, 22:20-24.)  The parties offer the following

19 competing constructions.

---

21 [9] Because the parties have agreed to a definition of "pointing device," it is unproblematic
   to include that phrase in both the term being construed and the court's construction of that term.
22 Indeed, including the phrase in the construction keeps the emphasis on the court's construction
   of "motion," which comprises the core of the dispute.

ORDER- 13

1    **CAAS's Proposed Construction:** "an amount of correlation." (CAAS Op. Br. at

2    11.)

3    **Envision's Proposed Construction:** "a numerical value assigned to the

4    likelihood that special information is being added as part of a voice recording or speech

5    signal based on the movement of a pointing device between predetermined areas on a

6    user interface screen." (Envision Op. Br. at 13.)

7    Envision seeks to import several pieces of context specific to claim 1 into the

8    construction of "correlation value," whereas CAAS seeks a more straightforward

9    construction. The court agrees with CAAS that it is inappropriate to construe the term by

10   incorporating its context but alters CAAS's proposed construction to provide greater

11   specificity.

12   Envision's proposed construction "is redundant given the surrounding words of

13   the claim—that is, the surrounding claim language already specifies" what the correlation

14   value is "assigned to" and what it is "based on." *Symantec Corp. v. Acronis, Inc.*, No.

15   C-11-5310 EMC, 2013 WL 752472, at *2 (N.D. Cal. Feb. 27, 2013); (Envision Op. Br. at

16   13).[10] In claim 1, the "correlation value" (Patent at 20:58) is "determin[ed]" (*id.* at 20:57)

17   _____

18   [10] *See also Brookhill-Wilk 1, LLC v. Intuitive Surgical, Inc.*, 334 F.3d 1294, 1299 (Fed.
     Cir. 2003) ("[T]he context of the surrounding words of the claim also must be considered in
19   determining the ordinary and customary meaning of those terms."); *Atser Research Techs., Inc.
     v. Raba-Kistner Consultants Inc.*, No. SA-07-CA-93-H, 2009 WL 691118, at *11 (W.D. Tex.
20   Mar. 2, 2009) ("The Defendants arrive at their construction first by including the surrounding
     words of the claim. Such inclusion is redundant and unnecessary."); *Toshiba Corp. v. Lexar
21   Media, Inc.*, No. C 03-0167 MJJ, 2005 WL 6218785, at *11 (N.D. Cal. Jan. 24, 2005) ("The
     remaining dispute here lies in whether the construction should explain from where and to where
22   the signal is outputted . . . . Toshiba argues that Lexar's focus on defining the means for
     outputting a collective verify signal is redundant because surrounding claim language explains

1   by "correlating the activity" (*id.* at 20:55-56), which "comprises motion of a pointing

2   device associated with the area" (*id.* at 20:52-54), "with at least a part of the speech

3   signal that corresponds with special information" (*id.* at 20:56-57). In other words,

4   besides its first three words, Envision's proposed construction is redundant with the claim

5   language that surrounds the term itself. *See Toshiba*, 2005 WL 6218785, at *11.

6   Furthermore, Envision's proposed construction is inconsistent with claims 8, 10, and 14,

7   which use the term "correlation value" but do not calculate the correlation value based on

8   the motion of a pointing device. (*See, e.g.*, Patent at 21:15-18.) Accordingly, the court

9   declines to adopt Envision's proposed construction.

10        CAAS's proposed construction is also flawed in that it fails to specify that

11   "correlation value" is not merely an "amount of correlation," but rather a number—

12   typically on a scale of zero to one—that indicates an amount of correlation. (*See id.* at

13   11:60-13:3.) This distinction is important because there could be other ways to measure

14   correlation—for instance, by verbal description—but the specification makes clear that

15   the Patent contemplates a numerical representation of the amount of correlation. (*See id.*)

16   The court accordingly alters CAAS's proposed construction to clarify that the

17   "correlation value" must be a number. The court construes "correlation value" to mean

18   "a number indicating an amount of correlation."

19

20   what generates the signal and what receives it. Lexar contends that including such language

21   would be beneficial to the jury to understand exactly what the collective verify signal does. . . .
[T]he Court declines to incorporate from whence the collective verify signal is output in its

22   construction of the claim phrase. To do so would improperly load up surrounding claim
language into the construction of a single phrase.").

3. <u>Disputed Term Seven: "rendering the special information unintelligible"</u>

The term "rendering the special information unintelligible" appears in claims 1, 8, 10, and 14 of the Patent. (Patent at 20:58-59, 21:23-25, 21:48-49, 22:22-23.) The parties dispute whether the term warrants construction and if so, the appropriate language.

**CAAS's Proposed Construction:** Based on the parties' agreed constructions of "special information" and "unintelligible," CAAS argues in its briefing that no further construction is necessary. (CAAS Op. Br. at 13.) However, at oral argument, CAAS indicated that rather than decline to construe the term, the court should adopt the first half of Envision's proposed construction: "processing a voice recording or speech signal containing special information to make the special information impossible to understand." (*See also* CAAS Op. Br. at 15 ("[T]here is no objection to the first portion of Defendant's construction . . . [,] which is 'processing a voice recording or speech signal containing special information to make the special information impossible to understand'. [sic]").)

**Envision's Proposed Construction:** "processing a voice recording or speech signal containing special information to make the special information impossible to understand, by manipulating or transforming data representing the speech signal from one form into another." (*Id.*)

The court rejects Envision's attempt to limit this term to instances when data is "manipulat[ed] or transform[ed] . . . from one form into another." (*Id.*) "Even when the specification describes only a single embodiment, the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim

1   scope using 'words or expressions of manifest exclusion or restriction.'"

2   *Liebel-Flarsheim*, 358 F.3d at 906 (quoting *Teleflex*, 299 F.3d at 1327).

3          Here, the specification expressly contemplates a broader understanding of what it

4   takes to "render[] the special information unintelligible" than Envision advocates.

5   Indeed, the language Envision cites in support of its argument that "all of the

6   examples . . . include some type of manipulation or transformation of the data" does not

7   support that conclusion.  (Envision Op. Br. at 17-18 (citing Patent at 8:55-67).)  One

8   example expressly contemplated by that specification excerpt is that a "zero amplitude

9   signal (erase) . . . is recorded . . . in place of . . . the segment of the voice recording

10  rendering the special information unintelligible."  (Patent at 8:60-64.)  This process can

11  be performed "before the voice recording is created"—in other words, "in real-time or

12  near real-time."  (*Id.* at 8:38-39.)  The court cannot square this embodiment with

13  Envision's argument that the Patent "never discloses or even suggests that special

14  information can be rendered unintelligible by <u>not recording</u> the information in the first

15  place." (Envision Op. Br. at 17 (emphasis in original).)  Envision fails to persuade the

16  court that there is a relevant distinction between ceasing recording and recording silence,

17  both of which are methods of "rendering the [personal, private, confidential and/or

18  sensitive information within a speech signal, depending on the context of a verbal

19  interaction] [impossible to understand]." *See supra* n.2.

20          Further intrinsic evidence supports the conclusion that deletion is one way to

21  render special information unintelligible.  The Patent description indicates that metadata

22  might be attached to the voice recording to indicate, *inter alia*, whether "special

ORDER- 17

1    information has been encrypted, deleted, masked, etc." (Patent at 6:39-40.) This section

2    of the specification supports the interpretation that "delet[ion]" is one method of

3    rendering special information unintelligible and further counsels against narrowing the

4    term as Envision proposes. (*See id.* at 6:37-40.) In sum, the specification does not

5    "demonstrate[] a clear intention to limit the claim scope" in the fashion Envision

6    advocates. *Liebel-Flarsheim*, 358 F.3d at 906.

7        At oral argument, Envision argued that the plain meaning of "rendering" requires

8    action, and that this meaning would exclude a passive method such as not recording the

9    special information. The court rejects this argument for two reasons. First, Envision

10    failed to properly raise the argument by omitting it from both of its briefs, leaving CAAS

11    insufficient opportunity to respond. (*See* Envision Op. Br. at 17-18; Envision Resp. Br.

12    at 8-9.) Second, the argument fails on its merits. The parties have agreed to construe

13    "unintelligible" as "impossible to understand." *See supra* n.2. Contrary to Envision's

14    argument, not recording an audio signal comports with the plain meaning of "rendering"

15    the signal "impossible to understand." The Patent specifications expressly contemplate

16    such real-time "rendering . . . unintelligible." (Patent at 8:39.) The court therefore rejects

17    Envision's plain meaning argument as a basis to narrow the meaning of this term.

18        Based on this conclusion, it is not obvious that this term warrants construction.

19    CAAS's revised proposed construction—to adopt the first half of Envision's proposed

20    construction—replaces "rendering . . . unintelligible" with "processing . . . to make . . .

21    impossible to understand." "Impossible to understand" is the parties agreed definition of

22    "unintelligible," meaning CAAS's proposed construction effectively replaces "rendering"

1    with "processing to make." Although this definition is accurate in the context of the

2    Patent, it is also a commonly understood meaning of "rendering," and it is therefore

3    unclear how the proposed construction would contribute anything "but meaningless

4    verbiage to the definition of the claimed invention." *Harris Corp. v. IXYS Corp.*, 113

5    F.3d 1149, 1152 (Fed. Cir. 1997).

6    However, CAAS and Envision at least implicitly agree that some construction of

7    the term would add clarity, and the court finds CAAS's revised proposed construction to

8    accurately—if verbosely—construe the term. Accordingly, the court construes

9    "rendering the special information unintelligible" to mean "processing a voice recording

10   or speech signal containing special information to make the special information

11   impossible to understand."

12   4.  Disputed Terms That Do Not Warrant Construction

13   A threshold issue in claim construction is whether the claim term needs to be

14   construed at all. *See, e.g., Hastings v. United States*, 78 Fed. Cl. 729, 733 (Fed. Cl.

15   2007). The district court need not "repeat or restate every claim." *U.S. Surgical Corp. v.*

16   *Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997). Rather, "[c]laim construction is a

17   matter of resolution of disputed meanings and technical scope, to clarify and when

18   necessary to explain what the patentee covered by the claims . . . ." *Id.*; *see also Harris*,

19   113 F.3d at 1152 (declining to adopt a proposed construction that "would contribute

20   nothing but meaningless verbiage to the definition of the claimed invention"); *Hastings*,

21   78 Fed. Cl. at 733 ("[I]f a claim element is clear on its face, or at least if the parties'

22   constructions would serve to obfuscate or warp its meaning, then the court may decline to

1    construe the element."). If the claim language is "clear on its face," the court's

2    "consideration of the rest of the intrinsic evidence is restricted to determining if a

3    deviation from the clear language of the claims is specified." *Interactive Gift Express,*

4    *Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1331 (Fed. Cir. 2001); *see also Metabolite Labs.,*

5    *Inc. v. Lab. Corp. of Am. Holdings*, 370 F.3d 1354, 1373 (Fed. Cir. 2004) (citing

6    *Vitronics*, 90 F.3d at 1582) (explaining that the court "may consider the patent

7    specification . . . [or] the prosecution history, if it is in the record, for evidence of an

8    intentional deviation from the plain meaning of a claim term").

9         In light of the three agreed constructions, *see supra* n.2, and the court's

10    construction of three disputed terms, *see supra* § III.B., the court concludes that the

11    remaining four disputed terms do not warrant construction.

12              a.  *Disputed Term Two:  "evaluating the motion of a pointing device"*

13        The term "evaluating the motion of a pointing device" appears in claim 1 of the

14    Patent.  (Patent at 20:55.)  The parties dispute whether the term warrants construction.

15        **CAAS's Proposed Construction:**  Based on the parties' agreed construction of

16    "pointing device" and the court's construction of "motion of a pointing device," no

17    further construction is necessary.   (CAAS Op. Br. at 9.)

18        **Envision's Proposed Construction:**  "analyzing movement of a pointing device

19    between areas on a user interface screen."  (Envision Op. Br. at 11.)

20        The parties principally dispute this term to generate another battleground over the

21    proper construction of "motion of a pointing device."  Envision proposes construing

22    "evaluating" to mean "analyzing" and then inserts its proposed construction for "motion

ORDER- 20

1   of a pointing device." (*Compare id. with id.* at 8.)  The court rejected Envision's

2   proposed construction of "motion of a pointing device" and construed that term to mean

3   "input that comes from a pointing device and controls the placement of a cursor or

4   pointer on a computer screen." *See supra* § III.B.1.  Accordingly, the only analysis

5   remaining for this term is whether "evaluating" has a meaning in the context of the Patent

6   of this term that differs from its plain and ordinary meaning.

7          Envision provides minimal and unconvincing support for the proposition that in

8   the context of the Patent, "analyzing" clarifies or more accurately construes the term

9   "evaluating." (*See* Envision Op. Br. at 11.)  Envision concedes that the term "evaluating"

10  does not appear in the Patent but nonetheless argues that its proposed construction is

11  "consistent with the examples [of evaluating] provided by the specification." (*Id.*)

12  Specifically, Envision contends that Figures 7 and 8 evince "some form of analysis."

13  (*Id.*)  However, just as Figures 7 and 8 evince "some form of analysis" of the motion of

14  the pointing device, they evince "some form of" evaluation. (*See id.*)  Moreover, in its

15  briefing, Envision omits any effort to differentiate "analyzing" from "evaluating." (*Id.* at

16  11-12; *see also* Envision Resp. Br. at 5.)  At oral argument, Envision argued that

17  "analyzing" makes clearer the numerical nature of the "evaluating" process.  The court

18  disagrees with this differentiation of the two words.  "Evaluating" incorporates an

19  element of valuation, whereas "analyzing" has broader meaning in this context.  As

20  illustrated by the specifications, the end result of this second step of claim 1 results in a

21  "correlation value." (Patent at 20:58.)  The court is therefore not persuaded by

22  Envision's interpretive argument.

ORDER- 21

1    Envision's argument that declining to construe this term will minimize its import

2    is also unpersuasive. (*See* Envision Op. Br. at 11-12; Envision Resp. at 5.)  The court

3    need not "repeat or restate every claim term in order to comply with the ruling that claim

4    construction is for the court." *U.S. Surgical Corp.*, 103 F.3d at 1568.  Rather, claim

5    construction is a method of resolving "disputed meanings and technical scope." *Id.*

6    Because a person of ordinary skill in the art would understand "evaluating" to have its

7    plain and ordinary meaning, the court declines to construe this term.

8            b.  *Disputed Term Three: "correlating"*

9        The term "correlating" or some permutation thereof appears in claims 1, 8, 10

10   ("correlate"), 14 ("correlate"), and 17 ("correlation") of the Patent.[11]  (Patent at 20:55,

11   21:15, 21:19, 21:42, 22:17, 22:33.)  The parties dispute whether the term warrants

12   construction and if so, the appropriate language.

13       **CAAS's Proposed Construction:**  If the term warrants construction, it should be

14   construed as "to establish a mutual or reciprocal relation between." (CAAS Op. Br. at

15   10.)

16       **Envision's Proposed Construction:**  "establishing a correspondence between the

17   motion of the pointing device and a portion of the speech signal." (Envision Op. Br. at

18   12.)

19

20       _____

21   [11] This list excludes the locations in which "correlation," a permutation of "correlating,"

22   appears as part of the term "correlation value," which the court construed above. *See supra*
     § III.B.2.

1      Envision's proposed construction suffers the same flaw as its proposed

2  construction of "correlation value," in that Envision seeks to incorporate context that is

3  expressly included in the claim's language. *See supra* § III.B.2. (citing *Symantec Corp.*,

4  2013 WL 752472, at *2); *Audionics Sys., Inc. v. AAMP of Fla., Inc.*, No.

5  CV 12-10763 MMM (JEMx), 2013 WL 9602634, at *19 (C.D. Cal. Sept. 12, 2013)

6  ("This construction is repetitive and incoherent because it purports to define what the

7  device can be programmed to do . . . , when the claims themselves specify, in more

8  precise terms, what it is that the device can be programmed to do . . . ."). Claim 1

9  expressly states that the Invention correlates "the motion of the pointing device" with "at

10  least a part of the speech signal." (Patent at 20:55-56.) Including the referents that are

11  correlated in the definition of the term "correlating" would render redundant the express

12  inclusion of those referents in claim 1. Furthermore, limiting "correlating" to refer only

13  to "the motion of the pointing device and a portion of the speech signal" would be

14  inconsistent with its use elsewhere in the Patent. For instance, claim 8 refers to

15  "correlating first image data from a user interface with second image data from the user

16  interface." (*Id.* at 21:15-16.)

17      CAAS equivocates on whether construction is warranted. (CAAS Op. Br. at 10.)

18  If it is warranted, CAAS advocates that the court use the definition referenced in the

19  prosecution history. (*Id.*) The definition that CAAS proposes, which is quoted in the

20  prosecution history, comes from Merriam Webster's online dictionary. (Vowell Decl.

21  (Dkt. # 28) ¶ 4, Ex. 2 at 13.) However, the proposed amendment in which this definition

22

ORDER- 23

1  appears does not expressly adopt the definition as pertinent to the Patent, instead using

2  the definition to differentiate the Patent from another, preexisting patent. (*Id.*)

3       To the extent the definition from Merriam Webster's online dictionary reflects the

4  definition intended in the Patent, it further demonstrates that "correlating" is not used

5  differently in the Patent than it is in common language. Claim construction is required

6  only "when the meaning or scope of technical terms and words of art is unclear . . . and

7  requires resolution to determine" the issue. *U.S. Surgical Corp.*, 103 F.3d at 1568. Here,

8  the meaning of "correlating" is "clear on its face," there is no evidence it takes on a

9  meaning other than its ordinary one, and a layperson can readily understand that

10  meaning. *Interactive Gift Express*, 256 F.3d at 1331. Accordingly, the court declines to

11  construe "correlating."

     *c.  Disputed Term Five: "determining a correlation value for the special information"*

     The term "determining a correlation value for the special information" appears in

claims 1, 8, 10, and 14 of the Patent. (Patent at 20:56-57, 21:21-22, 21:46-47, 22:19-20.)

The parties dispute whether the term warrants construction.

     **CAAS's Proposed Construction:** Based on the parties' agreed construction of

"special information" and the court's construction of "correlation value," no further

construction is necessary. (CAAS Op. Br. at 12.)

     **Envision's Proposed Construction:** "assigning a numerical value to the

likelihood that special information is being added as part of a voice recording or speech

ORDER- 24

1   signal based on the movement of a pointing device between predetermined areas on a

2   user interface screen." (Envision Op. Br. at 15.)

3        Envision's proposed construction incorporates much of its proposed construction

4   for the term "correlation value," which the court rejected above. *See supra* § III.B.2.

5   Further, the parties agreed to a construction of special information. *See supra* n.2. The

6   only unresolved dispute pertaining to this term, therefore, is whether "determining"

7   should be construed as "assigning." (*See id.*; CAAS Op. Br. at 12.)

8        Envision does not make an affirmative argument that "assigning" more accurately

9   construes the action in this term than does "determining." (*See* Envision Op. Br. at 15.)

10  Instead, Envision argues that declining to construe the term would "place[] almost no

11  limits on what sorts of operations are covered by the claimed step 'determining a

12  correlation value.'" (*Id.*) As an example, Envision posits that under CAAS's proposed

13  construction, it might be "sufficient for an infringer to determine any value related to the

14  special information, such as the time of day, amount or length of information, data rate,

15  or the like." (*Id.*) To the contrary, declining to construe this term does not leave it open

16  to any of the examples Envision suggests. The term expressly states that it only extends

17  to determining a "correlation value"—a term that the court has construed herein. (Patent

18  at 20:56-57); *see also supra* § III.B.2. As the court articulated when construing

19  "correlation value," *see supra* § III.B.2., the surrounding claim language makes clear that

20  the correlation value represents the relationship between "motion of a pointing device

21  associated with the area" (Patent at 20:52-54) and "at least a part of the speech signal that

22  corresponds with special information" (*id.* at 20:56-57). It is thus not "sufficient for an

ORDER- 25

1  infringer to determine any value related to the special information." (Envision Op. Br. at

2  15.)

3      In light of the other, construed terms, the court need only construe "determining a

4  correlation value for the special information" if "determining" carries a special meaning

5  in the context of the Patent or in the context of this phrase. *See U.S. Surgical Corp.*, 103

6  F.3d at 1568 (requiring construction only where the "meaning or scope of technical terms

7  and words of art is unclear . . . and requires resolution to determine" the issues before the

8  court). Here, the term itself makes clear is that the correlation value, once

9  "determin[ed]," is assigned to (or associated with) the special information. (Patent at

10  20:57.) The court finds no further clarification is warranted and accordingly declines to

11  construe this term.

12      *d. Disputed Term Six: "applying a threshold to the correlation value"*

13      The term "applying a threshold to the correlation value" appears in claims 1, 8, 10,

14  and 14 of the Patent. (Patent at 20:58, 21:23, 21:48, 22:22.) The parties dispute whether

15  the term warrants construction.

16      **CAAS's Proposed Construction:** Based on the court's construction of

17  "correlation value," no further construction is necessary. (CAAS Op. Br. at 12.)

18      **Envision's Proposed Construction:** "comparing the correlation value to a

19  numerical threshold value to identify portions of a voice recording or speech signal

20  containing special information." (Envision Op. Br. at 16.)

21      Envision correctly identifies that "[t]he essence of the 'applying' operation . . . is

22  comparing one value to another as a type of trigger for rendering data unintelligible."

1  (Envision Op. Br. at 16.)  However, as a matter of ordinary language, "applying a

2  threshold" to a value entails comparing the threshold to the value.  In other words,

3  "applying a threshold," as used in the Patent, is not a technical term or a word of art.  *See*

4  *U.S. Surgical Corp.*, 103 F.3d at 1568.  Furthermore, the subsequent language of claim

5  1—"rendering the special information unintelligible when the correlation value satisfies

6  the threshold"—makes it clear that the comparison Envision seeks to highlight occurs.

7  (Patent at 20:58-59.)

8         The latter half of Envision's proposed construction—"to identify portions of a

9  voice recording or speech signal containing special information"—conveys the purpose

10  of applying the threshold.  (*See* Envision Op. Br. at 16.)  However, the surrounding text

11  of claim 1 already makes clear that "when the correlation value satisfies the threshold,"

12  the special information is "render[ed] unintelligible."  (Patent at 20:58-59.)  This

13  component of Envision's construction therefore also adds nothing but redundancy to the

14  plain language of the term.  *See Symantec Corp.*, 2013 WL 752472, at *2.

15         The court rejects Envision's proposed construction because it would only add

16  "meaningless verbiage to the definition of the claimed invention."  *Harris Corp.*, 114

17  F.3d at 1152.  Moreover, because "the claim language is clear on its face," the court's

18  "consideration of the rest of the intrinsic evidence is restricted to determining if a

19  deviation from the clear language of the claims is specified."  *Compuserve*, 256 F.3d at

20  1331.  The only intrinsic evidence either party cites is part of the Patent description that

21  explains how an "algorithm . . . can be configured to initiate processing part of a voice

22  recording when an instantaneous correlation coefficient rises above a predetermined

1   threshold." (Envision Op. Br. at 16 (quoting Patent at 12:31-41).) This embodiment is

2   consistent with a straightforward reading of the term itself and thus bolsters the court's

3   conclusion not to deviate from the plain claim language. Accordingly, the court declines

4   to construe this term.

## IV.   CONCLUSION

6       For the foregoing reasons, the court rules as follows:

7       (1) the court CONSTRUES "motion of a pointing device" to mean "input that

8   comes from a pointing device and controls the placement of a cursor or pointer on a

9   computer screen";

10      (2) the court DECLINES TO CONSTRUE "evaluating the motion of a pointing

11  device";

12      (3) the court DECLINES TO CONSTRUE "correlating";

13      (4) the court CONSTRUES "correlation value" to mean "a number indicating an

14  amount of correlation";

15      (5) the court DECLINES TO CONSTRUE "determining a correlation value for

16  the special information";

17      (6) the court DECLINES TO CONSTRUE "applying a threshold to the correlation

18  value"; and

19  //

20  //

21  //

22  //

ORDER- 28

1    (7) the court CONSTRUES "rendering the special information unintelligible" to

2  mean "processing a voice recording or speech signal containing special information to

3  make the special information impossible to understand."

4    Dated this 6th day of June, 2016.

5

6                                      JAMES L. ROBART
                                       United States District Judge
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

ORDER- 29